16-1650 USA v. Nathaniel Pembrook16-1650 USA v. Nathaniel Pembrook16-1650 USA v. Nathaniel Pembrook16-1706 USA v. Shaeed Calhoun16-1707 USA v. David Briley16-1798 USA v. Orlando Johnson Oral argument to be 30 minutes shared by defendants and 30 minutes for the plaintiffs. Mr. Martin  Good morning, Your Honors. May it please the Court. Benton Martin of the Federal Defender Office on behalf of Nathaniel Pembrook. There are four appellants in this appeal and we're all going to split the time four ways just as a heads up. Because of time limits, there are a host of errors in this prosecution, but I'm going to focus on the unreliable cell tower science that was introduced to pinpoint the defendants' locations in the appeal. And really it came out in two ways. There was an expert that was qualified or certified by the district court that gave precise location data. It really flew in the face of a lot of warnings about this type of analysis. Also, there was location analysis based on cell phone science from an FBI agent who was never certified or qualified as an expert. The Supreme Court has given clear direction on this type of expert analysis. A warning in Dawbert that it can be powerful and quite misleading. I think that's what we have here. There is really a proliferation of this type of cell phone location tracking. Is your position that this type of evidence should never be admitted or that this particular expert somehow transgressed the bounds of stating what this sort of evidence may show? Right. That's my, the second. The second? Well, the witness did not claim, as I read the materials, that the towers could pinpoint the exact location of the phones, but only that it provided a several mile range of where the phones might have been. Is that right? That's right. So what's wrong with that? The problem is, and this is a very new technology, and we think about in terms of the type of science that's used in federal court, DNA being maybe the newest one was back in the 80s, and this has only been around in the last few years. And so I've cited what I think is the first textbook on the topic. It sounds like it's an argument that the evidence shouldn't be permitted at all. No, and that's why I'm going to read a portion of this book that talks about the need to do additional, that what was done in this case, which is that the expert looked at the bare record that they received from the phone company and they charted the path of what they put pins on a map, and the maps are on the record, of where, in his opinion, the defendants had traveled. What Joseph Hoy talks about in his textbook on this is that that's really the first step in identifying the location of a mobile phone, and that for any real level of precision, to be able to say, well, it may have been in this town. How precise were they trying to be here? Because my understanding, correct me if I'm just misunderstanding the whole thing, but my understanding was all they were trying to do is to show the progression of this phone across the country from Philly to Detroit. Right, and that was part of it. But there were also a few portions of the testimony that did put them at a more specific location. There was one where they said it was in New Buffalo overnight, and this was emphasized in the government's closing, which is where they had some video evidence of men getting into a car at a hotel. And that was particularly harmful in what regard? The fact that all the phones were located there overnight, pinned these particulars. That is an aspect of the factual proof that proved to be unfortunate for your clients. I'm not hearing anything that's problematic otherwise about that. The other thing I think that was problematic about the testimony is that they actually said that the two cell phones associated with my client's co-defendants were in the vicinity of his hospital when he was hospitalized in Philadelphia. And so they asked him, this was at the close of the government's direct examination of Agent Hess, who was the person who was qualified or certified as an expert. And they asked him, he said that Agent Max, the case agent, gave him the location of a particular hospital and that these two cell phones were in the vicinity of that hospital. And when you look at how they used that evidence in closing, the government talked about what do we know about the phones. We know that through Agent Hess' testimony and then the testimony of Brian Max, that the phones did this traveling that you were talking about. And then he says, we know that about the phones. So they didn't couch this in terms of, well, this may be where the phone was or this might be. It could have been. It was, we know that this is where these phones were going and where these phones were. I think it's particularly dangerous in all of the other cases. When you look at the cases from the Seventh Circuit, the Eleventh, this court's own critiques in Reynolds talk about when you try to put somebody in the vicinity of a particular building, that that is something that isn't supported by the science at this point. Well, but, you know, you could give testimony about whether the phones were in the vicinity of a particular building. You couldn't and the agent didn't purport to say that they were at the hospital or that they were at any particular location. The way I look at this, the fact that he didn't try to, didn't try to make it more specific, should have arguably been to your benefit because he didn't claim more for the evidence than it could offer. And so that's to your benefit. I mean, it leaves you free to argue to the jury that it could have been happenstance or that it could be unreliable. I mean, you'd be in much worse shape probably if a great deal more specificity had been claimed for the technology than would actually be the case, wouldn't you? That's true, but I think that even what was given was more precise than what should have been allowed. You would prefer imprecision, but I'm not sure how it's a benefit to you. To be less precise, they were in the vicinity of the hospital when he was admitted for his emergency. Well, I think that level of precision actually is too precise in what the science allowed. So it's not that in terms of whether this- That's okay. I'm finally absorbing what your position is, is that it exceeds the scientific authority that one has. Right, and there was really very little science put forward to the district court at that time. Okay, you don't like that one. What else don't you like? Well, I see my time is up, but the other thing that I wanted to address, and just real briefly, is the fact that they let the case agent, who never was qualified as an expert- Judge Batchelder is presiding. But the case agent also went over some of these exact same things, and I think the government is conceding that he wasn't an expert, that there's an emerging consensus that expert testimony is necessary when a case agent testifies about cell phone location data. They have not claimed that it would be harmless error, the fact that he testified about all of this stuff, if it was found to be erroneous. But they claim that he didn't render expert testimony because he wasn't- this is from their brief- didn't analyze where the phones were located. But he really did. He went through and said that he saw the same pattern that Agent Hess testified to. He was at the start and end of the case. He clarified some of the things about the expert's testimony. And subject to cross-examination? He was subject to cross-examination both times. That's correct. But he was- and there was an objection, especially later, when he was clarifying Agent Hess's testimony that what he's testifying to is expert testimony, and he hasn't been qualified as one. And the court said, well, I don't see this as expert testimony. Which, given the cases out of the second, the Natal case, Hill from the seventh, I think was an erroneous ruling. And the way that the government used it, it's the same quote I used before, but he said, we know through Agent Hess's testimony and then the testimony of Agent Brian Max this morning. So he really, they used it to confirm the accuracy of what their expert had testified to, which really is a backwards way to do things. So, yep. Thank you. Counsel. Good morning. May I please the court? Harold Gurwitz on behalf of Sheet Calhoun. And I've indicated that I'd like to reserve two minutes for rebuttal. The issue that I'd like to focus upon of those that I have raised concerns the consecutive sentences that were imposed upon my client for two separate violations of 924C, alleged in counts two and four of the indictment, because, according to the trial court, they were consecutive for different offenses. They both are alleged in the indictment to have occurred in the Eastern District of Michigan. It was the theory of the government at trial, however, that my client, Mr. Calhoun, was primarily responsible for first the rental of a car in Philadelphia, the white VW Passat, which was identified as having been present in West Bloomfield at the Tapper's Jewelry Store and also in the New Buffalo area at both the gas station and the motel where the individuals were identified by officer testimonies having been present overnight. The conduct as to Mr. Calhoun did not specifically focus upon any evidence or claim that he ever used a gun or was a person who entered either jewelry store for purposes of a robbery. He is charged with his responsibility for the 924C violation, then, based upon aiding and abetting. The Rosamond case decided by the Supreme Court in 2014 directly dealt with the issue of what are the elements of the offense for aiding and abetting as applied to 924C, and the court said that it punishes the temporal and relational conjunction of two separate acts on the ground that together they pose an extreme risk. The court said that the defendant must participate in the charge, the underlying conduct, the crime of violence in this case, with knowledge that a Confederate will carry a gun. That case should be read together with this court's decision in Wittig-Wangsa at 8-19-5-3-2-60, where the defendant was convicted of four separate 924C violations based upon two robberies and two conspiracy charges alleged for each of the robberies. The court analyzed that conduct based upon not the Blockberger double jeopardy analysis, but rather on the unit of prosecution, which it explained focuses upon the underlying offense conduct in the case. It said that the defendant must be responsible for carrying or possessing or using more than one time in order to be responsible for two separate violations. There is further explanation in the case cited in Wittig-Wangsa for support, Rents from the Tenth Circuit, an en banc decision written by now Justice Gorsuch, in which he examined a similar case that is certainly distinguishable in its facts from this because it involves a gun that was fired one time and caused the death of one person and the injury to another. But the analysis certainly does apply here, which says that there must be focus, again, as this court said, on the unit of prosecution. But the court, Justice Gorsuch, explained more carefully that in order for there to be unit of prosecution, there must be a minimum amount of activity for which liability attaches, and it must be independent. The court then said... Independent of what, I wonder? Independent of what? Of another act for which there is an alleged responsibility for a 924C violation. There must be one wholly different from and more reprehensible than the other initial violation, the court said at page 1112. As applied here to Mr. Calhoun, his conduct is, of course, is the aiding and abetting liability, as explained in the Rosamond case. There is no distinction. This is not, then, a case where the conduct is precisely simultaneous, but it is also not one that has been examined by the circuit in prior cases such as Burnett, where there were consecutive, separate, completely separate offenses. And it's our position that when the court applies these two cases together, the Rosamond and the Wittig-Wangsa cases is further explained in Rents, looking for the separate and completely independent act that there isn't one. There isn't a separate act by Mr. Calhoun that took place in the Eastern District of Michigan, as alleged. And for that reason, this court should then... Associate your argument with the acts you're talking about. What acts are you saying are independent by your client? There aren't any. That's what my position is. I know, but what does the government say he did? Well, the government says that he aided and abetted, that he was responsible. No, by what? In what action? By being present. Just the presence. Right. And the allegation is that these both acts took place in the Eastern District of Michigan. There was a special interrogatory to the jury, which asked whether... This is at Jewelry Store No. 1, where the shooting took place. I'm sorry, Your Honor? This is at Jewelry Store No. 1. Yes. Okay. Well, I doubt the government's theory was mere presence, because there's no way that's ever aiding and abetting. So what was the government's theory of the case? As I try to explain, as I understand it, it is that he was responsible for arranging for the car, for rental of the car in Philadelphia, and being present with the car during the course of this drive, tracked by the cell tower, the CSLI information from Philadelphia across the Midwest and back to Philadelphia. And no further involvement? You're saying that he's really not... There's no evidence of his having further involvement in either one of the two robberies, or the attempted robbery and the robbery? There's identification by a gas station attendant in New Buffalo that he was in that store that evening. There were photographs... He wasn't with the car. There's testimony that he wasn't with the car. Wasn't with the car? Was not with the car. He was in the vicinity of the car. He was outside of the car. Yes. I thought you just told us that somebody testified that he was in the bank. No, no, I did not say that, Your Honor. The gas station. He was in the gas station. He was in the gas station in New Buffalo. He was in the motel in New Buffalo, according to the government's evidence the way they explained it, and that he was in the parking lot outside of the Tapper's jewelry store. I don't recall that there's any evidence that places him by identification of his physical person in Grand Rapids. There's cell tower information. Is there information from which one could infer that he was aware of the use of a weapon in connection with the robbery? I think it's a theory. And that theory is that because Mr. Pembroke was injured at the Meadowar robbery in Grand Rapids, that he then must have been aware that there was a gun present. I don't believe that there's any other independent evidence of the presence of a gun before that time. Thank you, counsel. Thank you very much. Good morning, Your Honors. Martin Burris on behalf of David Briley, defendant in this matter. I'd like to reserve two minutes, if I could, for a rebuttal. In the limited time available, I would like to discuss the identification of Mr. Briley as one of the individuals who were involved in this conspiracy. As the Court knows, we've alleged in our brief that his identification was suggestive and unreliable. Mr. Briley was identified by a gas station clerk on the evening before the attempted robbery, and the robbery took place April 21st of 2014, I should say. Mr. Briley went into, or the person that was identified as Mr. Briley, went into the gas station at approximately 1101 and left the store at 1104. He was in the store for three minutes. He approached the clerk, Sue Graff, and made a purchase that took about 20 seconds. There was no apparent conversation with the store clerk. There was no indication that she had ever seen Mr. Briley before or had ever seen him after that particular brief encounter. After the events took place and the investigation commenced, the federal and state task force that was investigating the matter went and obtained various videos from the gas station, and they learned that the clerk was in fact Sue Graff. They attempted to contact her about a month later. She was unavailable, and approximately two months after this event, she ultimately was contacted by Detective Duboud, who was the state investigative officer, and ultimately identified a photo lineup indicating that Mr. Briley was one of the individuals in the gas station that night. Now, the complaint that Mr. Briley has about this was the fact that there was a motion to suppress, and at the time of the motion to suppress, there was no indication that there had been any other involvement by government or agents with Ms. Graff until the time that she identified the photo lineup, and I believe it was June 24, 2014. However, at trial, Ms. Graff took the witness stand, and she indicated that she had met and viewed the video of the encounter that she had that evening with this person, and that she recalled it specifically because she didn't have her glasses with her, and she couldn't really identify the grainy texture of the tape. It was rather difficult for her to identify, so they made blow-up pictures of that, or the officer had blow-up pictures of the individuals there, and she ultimately indicated that at that point she saw the pictures, which were blown up, and then she identified Mr. Briley. Inasmuch as the argument here is that this was a conspiracy and there was other evidence pointing your client, Mr. Briley, to this conspiracy with the other individuals, they were probably in the picture, too, as evidence is more than her identification. Do you see that as eliminating any evidence with respect to Mr. Briley and the charged conspiracy? No, Your Honor. We also have alleged in our brief that there was insufficient evidence. But without this individual pointing to him? This was the critical evidence in the case. You think? Absolutely. There was no question. Tell me why, please. Well, because this eyewitness was the only individual who had an eyewitness identification of Mr. Briley as having anything to do with the conspiracy. Everything else the government presented was based on inference. There were tons of videos that were taken at the jewelry stores everywhere else that they said he was not in them. They were unable to identify them. There was a telephone they associated with Mr. Briley that had numbers called that were associated with him and his family, but they never were able to establish that that was in his possession. But they did apparently, with this improper evidence, track him along with the others by cell phones, the locational evidence. Yes. Their assumption was that one of the cell phones was Mr. Briley's cell phone, which was number 7918, whereas proofs at trial show that he always, even prior to the events and after the events, had a telephone number 6615, which was still in Philadelphia at the time that these events took place. But in any event, as far as the improper and suggestive identification, this information was not available when the motion to suppress took place, and part of the reason that the court denied the motion to suppress was that it didn't really have any complaint by the defendant about the procedure involved. Video evidence, too, right? I'm sorry, Your Honor? Video evidence with respect to your client. They show him coming. He's in the parking lot of the jewelry store. The video evidence was inconclusive. Their own evidence technician who blew up these pictures even to 500 percent. There is other evidence. So inconclusive. She's unreliable, so the whole package doesn't work. That's correct, Your Honor. That's essentially our argument. With that, I see my time is up. Thank you. Please report. I'm Gary Krim. I'm here on behalf of Mr. Johnson. I would like to address the issue of the 924Cs. The Vitivonga case, which is out of Tennessee, that initially involved four conspiracy charges. There were two incidents, and in both, within a couple weeks of each other, they charged a drug offense, a drug conspiracy, and a Hobbs Act conspiracy of both offenses. Then they attached gun charges to both conspiracies at each location. What the court said was you could only get one, because the conduct for both gun charges involving the two conspiracies involved just one gun, one incident. You could only be sentenced on one 924C. That's essentially the claim we're making here. The 924C offense, both of counts two and count four, are alleged to have occurred in the West Eastern District of Michigan. The first robbery where the co-defendant was shot occurred in the Western Division, and no substantive charge was made on that. The conspiracy involved both charges, but the substantive robbery charge was in the Eastern District. The conduct, such as it is involving my client in the guns, is only in the Eastern Division. Other than the jury-determined nation, the government doesn't point to any specific evidence linking my client to a gun, other than the fact that there were guns used in the robbery themselves. But my client was never identified at the scene of the robberies, in the robberies themselves. He was in the vicinity, both the night before and then. There was some testimony about a hat. But the idea that he's part of the conspiracy doesn't lock him in here? He was part of the conspiracy, but the charge of the conspiracy was count three. Counts two and four involve identical allegations about possessing firearms. One related to the substantive robbery in the Eastern Division, and the second one in the Eastern Division relating to the conspiracy. Your brief poses the argument for reversal. Is that for reversal, or is this a sentencing? No, it's a sentencing. It doesn't reverse the conviction. On this issue, it's a sentencing. Okay. I forgot I wanted to read the question. You may. If there are no further questions, I'll sit down. Yes, sir. Thank you. May it please the Court, Chris Gravel on behalf of the United States. Your Honors, this investigation and the subsequent trial from the investigation rests upon reliable evidence and admissible evidence at trial. I'd like to begin with the cell phone technology, and I'll address each defendant's arguments in order. First, the cast evidence or the cell phone location evidence that was admitted in this case. I believe that Judge Gibbons, your analysis is on point here. The evidence that was admitted in this case talks about vicinity, not pinpoint. At no point do you see Special Agent Hess testify that any of the defendants is at a particular location, not in the Meadowires Jewelry Store in Grand Rapids, not in the Tapper's Jewelry Store in West Bloomfield, Michigan, and not even in the hotels or in the gas station in New Buffalo. He talks about vicinity. He admits that depending on where the antennas are pointed, this could be as close as five or seven miles away. At no point did the government attempt to use this evidence to actually put anyone in a particular location. And I think the cases that have found problems with this type of evidence, that's exactly what was attempting to go on. So in Evans, the same evidence that Special Agent Hess testified to in this case was actually admitted in the district court. The problem that the district court found in Evans was when they tried to do some type of granularization theory and put it in a far more pinpoint location. The same thing with Supla Vida, where the location, the building, was at the intersection of two sectors, and so they were trying to pinpoint it more closely. That is not the case in this. Did Agent Hess testify to the imprecision of this kind of technology? Did his testimony include that, as was the case in Hill? Yes. And so he testified both on direct and on cross. I believe it's in cross that he actually said that he had seen in his experience that the cell phone tower's power could reach five to seven miles away. But that was never the argument that this technology put anyone in any particular location other than the vicinity of New Buffalo, Grand Rapids, West Bloomfield. What about the argument that he never was qualified as an expert? Well, he was qualified as an expert. He testified as to his background, his training and experience, the same as every one of the precedents show. So, for example, in the Hill case, they talk about Special Agent Rasky, who does the same type of work in Chicago, and they went through his qualifications. Special Agent Hess testified in a very similar way in this case, how many hours of training he's received from the cell phone companies,  Was there an argument from Mr. Martin that he shouldn't have testified because he wasn't an appropriately qualified expert? I believe he was. The questions, the predicate questions were asked, I believe. The question about the non-expert refers to Agent Max, doesn't it? I believe so. And so Agent Max's testimony in this case. So Agent Max testified three different occasions in this. The first time, he testified during the first week of trial. The only thing he testified about in terms of cell phone is his investigative step, which he sought a court order, gave the court order for what's known as a tower dump, and gave a general description of what a tower dump is, that the FBI asks for all of the cell phones interacting with that tower. He did not give any type of expert testimony about how cell towers worked. The final time that he testified. He did three times. Yes. And so the second time he testified about some of the evidence that was seized from Mr. Calhoun and Mr. Briley at the time of the arrest, but I don't believe he testified about any of the cell phone information at that time. The third time was after Special Agent Hess testified. On cross-examination by Mr. Johnson's defense counsel, it was pointed out that none of the maps, Special Agent Hess's maps, put Mr. Johnson in the Grand Rapids area at the time. After Agent Hess left the stand, he reviewed the information over at Hess. He reviewed the cell phone documents and saw that there were calls there. We asked Agent Max to also review the records, which were already in evidence. And we're talking about the series of 54A through, I believe, G. It's the Verizon cell phone records. So after that cross-examination, before the government rested, we asked the court whether we could recall Special Agent Hess to clear up what had been an error in his maps. His maps had missed approximately, I believe it's seven or eight calls. And this is actually page ID 3983. This is Government Exhibit 54C. Agent Hess's maps had missed some cell phone. The district court denied our request to recall Special Agent Hess to testify. And so what the government did was call Agent Max to read these records to the jury. Essentially what Agent Max's last testimony was, was reading these calls, which had already been testified to by the Verizon custodian, Mr. Fred Powell. These are admitted. And so if the court compares Special Agent Max's testimony, his final testimony, with the Verizon custodial witness's testimony, who testified about these same phone calls and the same columns, and he read the same type of information into the record that Agent Max did, that is the only thing that- I bet the jury was transfixed. It was riveting. But why it was important was because when you compare 54C, these calls that Agent Hess had missed, with 54D, specifically page ID 4032, you can see, and this is the same thing that the court talks about in Kilpatrick, where if you are just reading voluminous records to the jury, this is not the type of expert testimony we're talking about, it shows, 54C shows, that it's Detroit Switch 11, cell phone tower 228. You then go to 54D, you look to cell phone tower Detroit 11, cell phone tower 228, and it gives an address. That's what Agent Max did. He read in the address. Now the address happens to be in Grand Rapids, and that's why it was important for the government to close that loop prior to closing arguments, but that's what Special Agent Max did. He gave no opinion. He read records. That final time he read records, he did the same thing. He was to correct the mistake by Hess. Yes. And so that's why Special Agent Max is not an expert. Yes, you normally need an expert to talk about what Special Agent Hess talked about, the operability of the cell phone network, but that's not what Agent Max was doing that final time up in his testimony. I'd now like to turn to the 924C issue. This case is not the Victor Visanga case. So in Victor Visanga, the government charged, they essentially double charged two different conspiracies. They charged it as a Hobbs Act and a drug conspiracy, and they attached 924Cs to that one. They had another one, and they charged that as a drug conspiracy and a Hobbs Act robbery conspiracy and attached two 924Cs to that. And it was the same use of the weapon in both separate conspiracies here. That's not what's happening here. We have two units of prosecution here. We have the substantive Hobbs Act at Tapper's with the use of the weapon. We have the conspiracy to commit Hobbs Act robbery, which extends from April 20th through April 23rd and includes the Benoist robbery in Grand Rapids, Michigan. And we have the use of the gun there. And so there's two different units of prosecution, the substantive Hobbs Act and the conspiracy. The verdict form and the reason that the district court modeled the verdict form was to ensure that there was no double jeopardy, that there wasn't a double counting of the gun for the Tapper's robbery. And so that's what the verdict form operated towards, the double jeopardy argument, which is separate and distinct from the Bennu argument. So there's two different things operating here. So what the verdict form did was ensure that the jury found two uses of the gun, two separate units of prosecution, and that's what was proved at trial. Now in terms of Bennu, whether we could charge the use and carry of a firearm that occurred outside of the district, the Supreme Court's already ruled on this. And that is the Rodriguez-Moreno case, the 1999 case, which the appellate counsel chose simply to ignore. And Rodriguez-Moreno says that as long as you have a continuing criminal act, and that's what the conspiracy was in this case, the proper Bennu can be where the conspiracy began, where it commenced, where it continued, and where it ends. And so the Eastern District of Michigan, we had proper Bennu. The Rodriguez-Moreno case says you can even charge the use and carry of a firearm, even though that use and carry did not occur in the district, if it's attached to the underlying predicate offense, which does have Bennu in that particular district, and that's what happened in this case. So this is not a double counting. This is not Victor Visanga where there's an improper type of stacking of 924Cs. This was to address two separate uses of the firearm. In terms of the use of the firearm, there is evidence on the record that showed Mr. Penbrook was the first person in the door. These are the videos at Exhibit 1. Mr. Penbrook was the first person in the door going into Meadowar's Jewelers. He had the gun out, and he was followed by three other people going into Meadowar's. He had the gun out and visible prior to ever entering that jewelry store. I think it's also important to note that there were actually six robbers in this case. The government was never able to identify two of the robbers. So to say, well, my client wasn't in the store, it's true. They wore masks. They wore hoodies pulled down over their faces. There's only so many people who can be getaway drivers. There's four people who went in the store. There's six people, two getaway drivers, four people in the store. So Mr. Penbrook went in with the gun already exposed going into Meadowar's. There is evidence when we talk about Mr. Calhoun and his role within the conspiracy. Yes, he rented the car, and we have the phone call to Enterprise Rental Car on April 21st talking about the White Passat. But we also have, and this is where the cell phone records, Appellant Counsel had focused on the location. But there is so much connectivity between the identified cell phones before, during, and after these robberies. Among them. Among them. And so, for example, the phone number that was identified as Mr. Calhoun is 0033. Mr. Johnson's phone calls Mr. Calhoun in the half an hour before the Meadowar's jewelry robbery. Mr. Johnson's phone is in connection with Mr. Briley's, the 7819 phone, before the Meadowar's robbery. He's on the phone with the- What about the argument that Briley is typically used a different phone and that this phone evidence, that's not his phone? That was presented to the jury by the defense. It was raised by the defense and rejected by the jury in this case. So what we know about the 7819 number, the one that the government argued was Mr. Briley's phone, was that it was a prepaid phone that we brought the T-Mobile representative on the stand. They identified it as being a prepaid phone with no identifiers as to who had it. But what the government did show to the 7819 number is that it made contact with Mr. Briley's ex-wife, Mr. Briley's daughter, a good friend of Mr. Briley, a Stephen Brown that he had contacted numerous times. Okay, so lots of evidence. Lots of evidence connecting Mr. Briley to that phone. We'll look at it. Yes. And so in terms of the 6615 number, that was presented to the jury. It was the government's theory and what was argued to the jury was he left his cell phone back in Philadelphia and took this essentially burner phone with him to commit the robberies. And that was a similar pattern to the other phones being used, that they were all prepaid phones, not in their own names. For example, Mr. Johnson, and this was presented to the jury using the 1434 number, actually went back to Philadelphia and gave that phone to Nakia Walker, who then began to use that phone as her own. And we called Ms. Walker to the stand. She identified that Mr. Johnson gave her that phone and also identified him in some of the still photos from the surveillance from Tappers and also at the gas station in New Buffalo. In terms of Mr. Briley and the identification of Mr. Briley, both by Ms. Graff and then larger, in the larger context, first, in terms of Ms. Graff, we're here in the position that the district court allowed that testimony to come in. And so the question of the district court allowing that evidence to come in, it's a clear error standard here on appeal. And based upon the photo lineup was not unduly suggestive and that Ms. Graff picked out Mr. Briley and Mr. Calhoun, the district court had a hearing pretrial on this case and allowed that in. And so under the clear error standard, we believe that that was permissible evidence. In terms of seeing other circumstantial evidence putting Mr. Briley there, and in reference to counsel's argument, well, it was only Ms. Graff is really the linchpin of the government's case, there's video from the gas station. The jury could see for themselves who was standing at the counter. They could compare that person to Mr. Briley. He had on an orange plaid shirt. There was evidence that after his cell phone was seized from the government and a search warrant was applied for, there was a picture of him in a very similar, if not the exact same, orange plaid shirt that was presented to the jury. Mr. Briley had a half beard, both at the time of the robbery and at the time of trial. So a beard with no mustache. Once again, a distinctive mark that the jury could also take a look at. When you add that in with the cell phone information, and then if you take a look at the series of exhibits from the Tapper's robbery, and this is the videos at Government Exhibit 11, and I would particularly point towards Government Exhibit 11D and 11K, and then we use blow-ups of those still photos at 14 and 15. What you see is the white Passat and the black minivan traveling together through the various parking lots around Tapper's. Two individuals step out of the white Passat. They walk into the mall. We believe, and the jury also believed and found, that that was Mr. Briley and Mr. Calhoun. If you take a look at the still photos and compare them to the photographs you have in the photographic lineups, and this is what we argued, that was Mr. Briley and Mr. Calhoun, and they walked past the Tapper's on multiple occasions there. And then another individual came out of the black van and walked past the Tapper's. This is all within the hour before the actual robbery occurred, and that person from the black minivan was Mr. Orlando Johnson. And we presented evidence to that, and that's who Nakia Walker identified as being Orlando Johnson. So in terms of this, all of the arguments here today about whether it's the cell phone location data or the photographic ID as being the linchpin, no. All of these pieces fit together and put these four individuals at the robbery and committing the robbery. And so we believe that in total that the evidence supports the convictions in this case. It was a reliable evidence, admissible evidence, and these convictions should be sustained. And absent any questions, I believe I'm done. I think we have none. Thank you, Counselor. Thank you. Just waiting for that to adjust. Thank you. Just real briefly, on the issue of Agent Max, and I think it was the second time he testified, and I'd point the court to page ID 2660 through 2665. When he does assert, just like Agent Hess, that the cell site records show that these phones were traveling to Philadelphia, then through multiple states, stopping overnight in New Buffalo, returning to Philadelphia, and that, in his opinion, they're traveling the same route. That requires expert analysis of cell site records. Also, I just wanted to push back quickly on the idea that just because he said it was the general vicinity, that that made it okay, I'd point the court to the Hill case from the Seventh Circuit, and that the majority there, the court said that it's more problematic when they say something was in the general vicinity versus when they say it's not. That's the same language they used, to be more problematic is what we have here. Thank you, Counselor. I take issue with Mr. Gravlin's characterization of what a unit of prosecution is. He refers to the two offenses as units of prosecution. I think that this court, in Wittig-Wangsa, and also by reference to Rents, that it is not just the offense, it is the minimal level of activity that's necessary in order for that underlying offense to have been something in which the defendant manifested his intent to participate as an aider and abetter. That's what the court says by reference to Rents, and that isn't shown here. I take issue also with reference to this case as one of double jeopardy. Wittig-Wangsa very specifically says that it's a statutory interpretation matter. It's an interpretation of 924C. It's not double jeopardy analysis under Blackburger, which applies. It's also not a venue issue. Count 4 of the indictment, as I said before, specifically alleges that the offense took place in the Eastern District of Michigan. And finally, the special interrogatory from the- You heard counsel cite Moreno. I'm sorry? You heard counsel cite Moreno. I did. So quarrel with that. That's about venue. This case isn't about-this issue about the 924C is not the same as a question of venue. But he's charged in Eastern District of Michigan. It could. What's the point of that? That's right. That's right. So that would say that venue could be present for an offense that took place there. But this is a question of what the unit of prosecution is, not where venue is to be located. The special interrogatory that was included in the instruction asked if the jury unanimously found that the use and carry of the firearm was during in relation to conduct separate and distinct from the conduct charged in Count 1. I think that that's an impossibility in this circumstance. The conspiracy included everything. There wasn't any conduct in the Eastern District of Michigan that was separate and apart from the offense conduct related to the robbery. The conspiracy included the robbery. If conspiracy had not been charged in this case and the only offense was the Tappers robbery, I think that the government would have been successful in presenting evidence about the travel from Philadelphia to get to Tappers to rob it. And so the instruction, the interrogatory didn't forward the government's position one bit, I think. And for those reasons, I would ask the court to reverse as to this issue of this consecutive 25-year sentence that was imposed on Mr. Calhoun based upon these theories. Thank you. Thank you. Just a couple of points in rebuttal, Your Honor. The government's theory that the phone 7819 belonged to Briley, you know, is a theory that they presented at trial. But one thing they have not explained is the fact that there were calls during this period of time between 78119 and 6615, which was Mr. Briley's phone, which was also the phone that he possessed when he was arrested at that particular time. And also there was an e-mail admitted by the government at trial that indicated messaging from him to his daughter that the only phone he owned to be contacted on was 6615. The other problem is that at the time that the court made its ruling on the admissibility of the photo lineup, it did not have the knowledge that Ms. Graff first testified to at trial that she had actually viewed the video with a government agent. Where was your client when he was arrested? He was in Philadelphia. So why wouldn't he have been able to pick up that cell phone that he had left in Philadelphia, according to the government, and have it on his person when he was arrested? Certainly that's within the realm of probabilities, but it's the phone that he always had. In fact, the government introduced testimony from the Pennsylvania Department of Corrections that Mr. Briley had used that phone to contact people there. So it was unquestionably established that it was his phone. And other than the fact that there were some people that were called related to Briley's family, there was no direct – nobody came in and said, I received a call from Briley on 7819. Nobody at trial. The government brought no one in as a witness. They just used that as a theory that it was his phone and that was following him along to this robbery. As far as the video goes, Detective Thomas, at page ID 2816, clearly indicates that there was no basis for identification from the video. It's just I encourage the court to look at that. And I would just ask the court to consider my other arguments in my brief and also the joiners that I filed on behalf of Mr. Briley in reverse of his convictions. Thank you. We're not talking here about what the government could have done in their indictment. In the 924Cs in Count 2, it is in the Eastern District of Michigan, the defendants, etc. On Count 3, where the conspiracy occurred elsewhere, they say in the Eastern District of Michigan and elsewhere. In Count 4, which is the charge that relates to the conspiracy, they're talking about in the Eastern District of Michigan. While they may have had the power to have indicted more broadly, on the 924Cs, they charged only the behavior in the Eastern District of Michigan. Thank you. Go ahead. I do not have a question. I was just absorbing what you said. Thank you, counsel. The case will be submitted. Clerk may call the next case.